# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

*********************************** )
**Monte Carlo Cruise Concessions, Inc.,** )
        **Appellant,** )
**v.** )
**Donald Lassman, Trustee,** )
        **Appellee.** )
*********************************** 

Civil Action No.:
04-CV-12215-DPW

## BRIEF OF APPELLANT

Now comes the appellant, Monte Carlo Cruise Concessions, Inc., (hereinafter "Monte

Carlo") and submits its brief appealing from a decision of the Bankruptcy Court dated January 20,

2004.

## I. PROCEDURAL BACKGROUND

The matter originated as an adversary proceeding filed in the Bankruptcy Court by Donald

Lassman, the trustee of the bankrupt estate, Fisherman's Wharf Excursions, LLC (hereinafter

"Fisherman's Wharf"). Lassman, as trustee, sought to recoup monies from Monte Carlo that had

been paid by Fisherman's Wharf pursuant to a charter party entered into between the parties for

the charter of the M/V MIDNIGHT GAMBLER. A copy of the charter party was attached to the

plaintiff Fisherman's Wharf's complaint and a copy is appended hereto for the Court's review.

Following discovery, Lassman moved for summary judgment, contending that pursuant to

bankruptcy law, the payments made by Fisherman's Wharf should be returned to the bankrupt's

estate. Monte Carlo opposed this motion contending that maritime law applied and that the

charter party controlled. The motion for summary judgment was denied.

The matter then proceeded to a trial in the Bankruptcy Court. The Court heard testimony

and received documentary evidence. Strangely, the Court held that maritime law would not be

applied to the dispute because the applicability of maritime law was not identified in the Pre-Trial Statement, despite it having already been a clear issue in the case and set forth in the clear language of the charter party (see paragraph 30 (c)).

The Bankruptcy Court issued its decision on or about January 20, 2004. Monte Carlo then filed its notice of appeal. Lassman then filed a Request to Dismiss Appeal, because Monte Carlo had missed some deadlines by a few days. The Bankruptcy Court granted the Request to Dismiss Appeal. Monte Carlo then filed a Motion for Reconsideration, which was also denied by the Court.

There may be some confusion because there are actually two appeals before this Court. The first addresses the decision of Judge Hillman, dated January 20, 2004. Monte Carlo appeals from this decision despite Judge Hillman's dismissing of the appeal. To preserve its rights, Monte Carlo also appeals from the denial of its Motion for Reconsideration. (Monte Carlo paid two filing fees to the Bankruptcy Court).

Also present before this Court are Monte Carlo's Motion to Review Order of Bankruptcy Court, and Motion to Reinstate Appeal. Monte Carlo desired these motions to be filed in this Court, but because there was confusion in the Bankruptcy Court's clerk's office, the file was not actually transferred over to this Court until sometime later and thus, to save its rights, Monte Carlo timely filed these motions in the Bankruptcy Court.

## II. BACKGROUND

Many of the facts of this case are set forth in Judge Hillman's opinion of January 20, 2004. The M/V MIDNIGHT GAMBLER was owned by Monte Carlo Cruise Concessions, Inc. which entered into a charter party with Fisherman's Wharf. Pursuant to the language of the charter party, certain sums were advanced to Monte Carlo. Fisherman's Wharf then defaulted on the

2

terms of the charter party and the vessel was taken back by Monte Carlo (see paragraph 6 (a)). Monte Carlo contends that pursuant to maritime law and the clear language of the charter party, not only were the amounts in the payments that were made fully earned, but that all charter payments for the duration of the charter are also fully earned (see paragraphs 28 (a) and 28 (c) of charter party). The Bankruptcy Court refused to apply maritime law, refused to recognize the clear language of the charter party and made a finding that Monte Carlo owes $91,000 back to Lassman as trustee of Fisherman's Wharf.

## III. ISSUE ON APPEAL

Whether the Bankruptcy Court erred in determining that maritime law does not apply to this dispute, and by not applying maritime law, whether the Bankruptcy Court wrongly refused to accept the terms of the charter party and improperly found that Monte Carlo owed some of the monies back that it had received from Fisherman's Wharf.

## IV. ARGUMENT

### a. The Charter Party Clearly Provides That All Payments Are Fully Earned

A charter party is a maritime contract. *John W. Hoyne v. Peter Kiewitt Sons, Inc., et al.* 47 F. Supp. 761 (N.D. ILL. 1976). Federal maritime law principles control a charter party dispute even though the litigants may invoke the federal court's diversity rather than the federal court's admiralty jurisdiction. *Id.* Although actions involving maritime law may be brought in state courts, the latter are bound to apply federal substantive law rather than their own rules of procedure if such rules would be outcome-determinative. *In re Arbitration A/S J Ludwig Mowinckels Rederi v. Dow Chemical Company, et al.* 255 N.E.2d 774 (N.Y. 1970). To permit rights under a charter party to be litigated under the common law or statutory law of a state

would defeat the uniformity which the Constitution requires in maritime law. *Jack Nielson, Inc. v. Tug Peggy, et al.* 1970 AMC 1490 (5th Cir. 1970).

Federal law governs the interpretation of charter parties. *Atlantic Lines, Ltd. v. Narwhal, Ltd.,* 514 F.2d 726, 721 (5th Cir. 1975), *Otto Candies, Inc., v. McDermott International, Inc.,*600 F. Supp. 1334, 1339 (E.D.L.A. 1985). Furthermore, charter agreements should be interpreted in accordance with general principles of contractual construction. *Otto Candies, Inc.,* 600 F. Supp. at 1339 (E.D.L.A. 1985).

The parties to a charter may contract as they choose and are bound by the terms of the contract as set forth. *Texas and New Orleans Barge Line, Inc., v. Tug Patsy H and Nagel Towing Co., Inc.,* 279 F. Supp. 697, 698 (1968). Furthermore the court's function should not be to "rewrite the charter agreement but to interpret it." *Id.*

During the trial, the Court surprisingly stated that the applicability of maritime law had not been raised by Monte Carlo. This was shocking and clearly erroneous as it flies in the face of not only the briefs submitted with regards to the Motion for Summary Judgment, but also the very clear terms of the charter party itself.

Further, in the Pre-Trial Statement, the issue of law to be litigated was "whether money received by Monte Carlo in excess of the first month's charter fee constitutes property of the estate, to be turned over to the trustee." This certainly implies that the Court will correctly apply the law to the issue. In other words, the issue of law presented for the Bankruptcy Court was not in any way a waiver of maritime law, and did not contain a statement that some other law should apply. Certainly the language of the charter party was not a surprise to anyone as it was the key document in the case from the beginning.

The trustee himself had placed the issue of maritime law before the court by attaching a copy of the charter party to the complaint. Judge Hillman incorrectly states on page seven that "nowhere in its argument or briefing does [Monte Carlo] offer any proof that general maritime law differs from the general common law when it comes to the construction of contract provisions." The very terms of the charter party itself clearly state that all money due under the charter party is due should there be a default by the charter (see paragraphs 6, 28 and 30 (c) of the charter party). The Court improperly cites *Princess Cruises, Inc. v. General Electric Co.,* 143 F.3d 828 (4th Cir. 1998), which did not even concern a charter. *Princess Cruises* actually supports the proposition that the primary concerns of admiralty law are uniformity and predictability. In *Princess Cruises,* the court stated that admiralty law may look to the common law or state law to supply the rule of decision <u>when no federal statute or established rule of admiralty exists</u>. *Id.* at 834. This is not the situation here as there is a wealth of case law on charter parties.

Monte Carlo did not waive any argument that admiralty law should apply to this dispute. Even if it did waive the argument in some way, the Court still had before it the charter party with its clear language. The Court erroneously ignored the clear terms of the charter party in arriving at its next conclusion, i.e., that Monte Carlo owed $91,000 back to the estate.

### b. The Award Should be Reversed Because of Plain Error

Even if it is determined by this Court that Monte Carlo waived the applicability of maritime law and that Monte Carlo's appeal should be dismissed because of failure to comply with deadlines established by the Bankruptcy Court, the doctrine of clear error should apply in the instant case to reverse the unjust result below. In *Chestnut v. City of Lowell,* 305 F.3d 18 (1st Cir. 2002), the court held that in a civil case an award should be reversed on plain error to prevent an

5

injustice. By not applying maritime law and the clear terms of the charter party, the Court

committed an error that is plain. There was prejudice to Monte Carlo as the Court failed to apply

the terms of a negotiated contract between two commercial parties. Finally, there was a

miscarriage of justice as the trustee has reaped a windfall. If this Court finds that Monte Carlo

somehow waived its rights either through the pre-trial statement or by missing certain deadlines,

this Court should apply the plain error doctrine and reverse the result of the Bankruptcy Court.

## V. CONCLUSION

In the interests of justice, this Court should reverse the order of the Bankruptcy Court and

enter judgment that no money is due to the trustee from Monte Carlo.

By its attorney,

*Seth S. Holbrook*

Seth S. Holbrook, BBO # 237850
HOLBROOK & MURPHY
150 Federal Street, 12th Floor
Boston, MA 02110
617-428-1151

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)
on___11/8/04___

*Seth S. Holbrook*

# BAREBOAT CHARTER

THIS CHARTER PARTY, made and concluded this 15th day of May, 2000, between MONTE CARLO CRUISE CONCESSIONS, INC., a Florida Corporation and owner of the Motor Vessel "MIDNIGHT GAMBLER," (hereinafter "OWNER") and FISHERMAN'S WHARF EXCURSIONS, L.L.C., a Massachusetts company, (hereinafter "CHARTERER").

## WITNESSETH

OWNER agrees to let, and the said CHARTERER agrees to hire the M/V "MIDNIGHT GAMBLER", for a period beginning 15th May 2000 (Date of Delivery") and ending 14th November 2000 ("Date of Re-Delivery") as set forth herein, within the below mentioned trading limits. Included in this Charter is the right to use any service marks and/or the name and logo M/V "MIDNIGHT GAMBLER" during the term hereof. Vessel to be placed at the disposal of the CHARTERER in Fort Pierce, Florida, in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide) as the OWNER may direct. Vessel on her delivery to be ready, staunch, strong and in every way fitted for the service, in such lawful uses, between safe port and places within the trading limits set forth herein, excluding all Cuban ports and communist controlled ports and all other ports not mentioned in this Charter Party, on the following conditions:

1. DEFINITIONS.
   In this Charter, the following terms shall have the meanings hereby assigned to them:
   "OWNER" shall mean the person or company registered as owner of the vessel.

   "CHARTERER" shall mean the Bareboat charterer and shall not be construed to mean a time charterer or a voyage charterer.

   "VESSEL" shall mean the Motor Vessel, "MIDNIGHT GAMBLER." O.N. 851833 built in Australia and a Panamanian registered vessel. LOA 32.93 meters (108 feet), beam 8.72 meters (28 feet 6 inches), draft 2.30 meters (7 feet 5 inches), gross tonnage 372, net tonnage 147.

2. PAYMENT.
   That the CHARTERER shall pay for the use and hire of the Vessel at the rate of Sixty Thousand Dollars ($60,000.00) United States currency per month plus all applicable taxes, duties and other applicable charges commencing on and from the day of her delivery, as aforesaid, and at and after the same rate of any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the OWNER (unless lost) unless otherwise mutually agreed to in writing.

   CHARTERER shall pay an additional Ten Thousand Dollars ($10,000.00) United States currency per month for insurance coverage of the Vessel commencing on and from the day of her delivery, as aforesaid, and at and after the same rate of any part of a month until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the OWNER (unless lost) unless otherwise mutually agreed to in writing.

Page 1 of 15

Initials as to OWNER          Initials as to CHARTERER

Payment of said hire and insurance coverage to be made in Miami at the direction of OWNER'S counsel, BLANCK & PERRY, P.A., 5730 S.W. 74th Street, Suite 700, Miami, Florida 33143, in cash or a cashier's check in United States currency. Payment terms are Sixty Thousand Dollars per month ($60,000.00) plus all applicable taxes, duties and other applicable charges, as well as Ten Thousand Dollars per month ($10,000.00) for insurance coverage. The initial sum due at signing is One Hundred Forty Thousand Dollars ($140,000.00) plus all applicable taxes, duties and other charges as may be applicable. Said amount consisting of the first month and last month's rent plus all applicable taxes, duties and other charges that may be applicable as well as payments for insurance coverage.

Additional security in the amount of Sixty Thousand Dollars ($60,000.00) shall be provided in the form of a letter of credit, and shall be placed in the trust account of Owner's counsel, BLANCK & PERRY, P.A., 5730 S.W. 74th Street, Suite 700, Miami, Florida 33143, upon the signing of this charter agreement. The letter of credit shall be replaced with cash in the amount of Sixty Thousand Dollars ($60,000.00), on or before 15 July 2000. These funds shall be made payable to, and held in, the trust account of Owner's Counsel

3.    DELIVERY.

The Vessel shall be delivered and control assumed by the CHARTERER in Fort Pierce, Florida, or any other port in Florida as the OWNER may direct on 15th May 2000.

The OWNER shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this charter. The Vessel shall be properly documented under the laws of Panama at the time of delivery.

The delivery to the CHARTERER of the Vessel and the taking over of the Vessel by the CHARTERER shall constitute a full performance by the OWNER of all the Owner's obligations under Clause 2, and thereafter the CHARTERER shall not be entitled to make or assert any claim against the OWNER on account of any conditions, representations or warranties expressed or implied with respect to the Vessel.

3.    TIME FOR DELIVERY.

The Vessel shall not be delivered before 15th May 2000.

4.    CANCELLING.

Should the Vessel not be delivered latest by 17 May 2000, the CHARTERER has the option of canceling this Charter.

If it appears that the Vessel will be delayed beyond 17 May 2000, the OWNER shall, as soon as it is in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the CHARTERER asking whether it will exercise its option of canceling, and the option must then be declared within forty-eight (48) hours of the receipt by the CHARTERER of such notice. If the CHARTERER does not then exercise its option of canceling, the second day after the readiness date stated in the Owner's notice shall be regarded as a new canceling date for the purpose of this Clause.

Page 2 of 15

Initials as to OWNER    Initials as to CHARTERER

5.    **DEFAULT**

Each of the following events (each an "Event of Default") shall constitute an Event of Default hereunder:

(a)    CHARTERER fails to make any payment when due;

(b)    CHARTERER breaks any promise CHARTERER has made to OWNER, or CHARTERER fails to comply with or to perform when due any other term, obligation, covenant, or condition contained in this Charter or any agreement related to this Charter, or in any other agreement CHARTERER has with OWNER;

(c)    Any representation or statement intentionally made or furnished to OWNER by CHARTERER or on CHARTERER'S behalf is false or misleading in any material respect either now or at the time made or furnished;

(d)    CHARTERER becomes insolvent, a receiver is appointed for any part of the CHARTERER'S property, CHARTERER makes an assignment for the benefit of creditors, or any proceeding is commenced either by CHARTERER or against CHARTERER under any bankruptcy or insolvency laws;

(e)    Any creditor tries to take any of CHARTERER'S property on or in which CHARTERER has a lien or security interest. This includes a garnishment of any of CHARTERER'S accounts, including deposit accounts, with OWNER;

(f)    Any of the events described in this default section occurs with respect to any guarantor of this Charter;

(g)    A material adverse change occurs in CHARTERER'S financial condition, or OWNER reasonably believe the prospect of payment or performance of the Charter is impaired;

(h)    OWNER in good faith deems itself insecure as a result of any of the stated Events of Default occurring;

(i)    Arrest of the Vessel in accordance with maritime law.

6.    **REMEDIES**

If an Event of Default shall occur as specified in subparagraph 5(a) and is not cured within five days, or if an Event of Default shall occur as specified in subparagraphs 5(b) – 5(i) and is not cured within fourteen days, OWNER shall have the right to exercise any one or more of the following remedies, at its option, at any time, without notice, and subject to applicable law:

Initials as to OWNER          Initials as to CHARTERER

(a)  Terminate this Charter and assume immediate possession of the Vessel, without prejudice to OWNER' rights under this Charter.;

(b)  Declare the entire amount of unpaid Charter Hire for the balance of the term of this Charter immediately due and payable causing the acceleration of all monies due under this Charter, whereupon CHARTERER shall become obligated to pay to OWNER forthwith the entire value of the remaining time period of the Charter;

(c)  Without further demand or legal process enter into the premises where the Vessel may be found and take possession of and remove the Vessel, without liability for suit, action or other proceedings, and all rights of CHARTERER in the Vessel so repassed or removed shall terminate absolutely.

(d)  Cause CHARTERER, at CHARTERER' expense, to promptly return the Vessel to OWNER and in the condition required hereunder. CHARTERER hereby waives notice of, the posting of any bond in regard to, and hearing with respect to, such retaking. OWNER, at their option, may use, ship, store, repair or lease Vessel and equipment repossessed and sell, re-charter, or otherwise dispose of the Vessel and any such equipment at CHARTERER'S location without any obligation to pay rent or other charge or elsewhere and at private or public sale.

(e)  CHARTERER shall be liable for an shall pay to OWNER all expenses incurred by OWNER in connection with the enforcement of any of OWNER' remedies. This includes, subject to any limits under applicable law, OWNER' reasonable attorneys' fees and OWNER' reasonable legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgment collection services. If not prohibited by applicable law, CHARTERER also will pay any court costs, in addition to all other sums provided by law, also including all reasonable expenses of repossessing, storing, shipping, repairing and re-chartering or selling the Vessel, and OWNER' residual interest in the Vessel.

(f)  Wherever any payment of Charter Hire or other charge is not received by OWNER in cash when due hereunder, after five (5) days notice, CHARTERER agrees to pay the OWNER (as an administrative charge, occasioned by such delay), not later than the first day of the calendar month, an amount calculated at the rate of five cents ($0.05) per one dollar ($1.00) of each such delayed payment, but such charge shall not exceed the maximum allowed by law.

(g)  Subsequent to a declaration of an Event of Default and acceleration of Charter Hire by OWNER, CHARTERER agrees to pay OWNER interest on all sums due OWNER (other than those attributable to late charges and interest, if any) at the rate of one percent (1%) per month but not to exceed the maximum rate provided by applicable law. Such amounts shall be payable in addition to all amounts payable by

Page 4 of 15

Initials as to OWNER        Initials as to CHARTERER

CHARTERER as a result of exercise of any one or more of the remedies herein provided.

(h)     All remedies of OWNER hereunder are cumulative, are in addition to any other remedies provided for by law or in equity, and, to the extent permitted by law or in equity, may be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy, or to preclude the exercise of any other remedy at a later time. No failure on the part of the OWNER to exercise, and no delay in exercising, any right or remedy shall operate as a waiver thereof or modify the terms of this Charter. The waiver of any Event of Default shall not be a waiver of any other or subsequent Event of Default. In the event that this Charter is determined to be a security agreement, OWNER' recovery shall in no event exceed the maximum permitted by law.

7.     **NAVIGATIONAL LIMITS.**
The Vessel shall be employed in lawful trades for carriage of passengers within the following navigational limits:

The Vessel shall be restricted to the coastal waters off the East Coast of the United States and within 20 nautical miles of said coast. Without prior written consent of the OWNER, the Vessel shall not be docked, navigated or operated outside of these limits.

8.     **CAPTAIN AND CREW**
CHARTERER agrees to man the Vessel with a competent captain having such licenses as may be required by law, and with competent crew, as required.

The CHARTERER'S captain and crew shall be responsible for the safe navigation of the vessel and the CHARTERER shall abide by his judgment as to sailing, weather, anchorages, and other pertinent matters

9.     **USE OF VESSEL**
The Vessel shall not be used for the transport of cargo. The Vessel shall be employed only for the carriage of passengers and their personal belongings, and other lawful purposes.

The CHARTERER undertakes not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the instruments of insurance (including any warranties expressed or implied therein) without first obtaining the consent to such employment of the insurers and complying with such requirements as to extra premium or otherwise as the insurers may prescribe. If required, the CHARTERER shall keep the OWNER and the Mortgagees advised of the intended employment of the Vessel.

The CHARTERER agrees that it will operate the Vessel at a port in which it is legal to operate Vessel. The parties agree that the Vessel shall be restricted to the coastal waters off the East Coast of the United States.

Initials as to OWNER          Initials as to CHARTERER

The CHARTERER also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.

10. **SURVEYS.**

The OWNER and CHARTERER may each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder.

11. **INSPECTION.**

The OWNER shall have the right at any time to inspect or survey the Vessel or instruct duly authorized surveyors to carry out such survey on their behalf to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. Inspection or survey in dry-dock shall be made only when the Vessel shall be in dry-dock for the Charterer's purpose. However, the OWNER shall have the right to require the Vessel to be dry-docked for inspection if the CHARTERER is not docking her at normal classification on maintenance intervals. The fees for such inspection or survey shall in the event the Vessel being found to be in the condition provided in Clause 9 of this Charter be payable by the OWNER and shall be paid by the CHARTERER only in the event the Vessel being found to require repairs or maintenance in order to achieve the condition so provided. All times taken in respect of inspection, survey or repairs shall count as time on hire and shall form part of the Charter period.

The CHARTERER shall also permit the OWNER to inspect the Vessel's logbooks whenever requested and shall whenever required by the OWNER furnish them with full information regarding any casualties or other accidents or damage to the Vessel. For the purpose of this Clause, the CHARTERER shall keep the OWNER advised of the intended employment of the Vessel.

12. **INVENTORIES AND CONSUMABLE OIL AND STORES.**

A complete inventory of the Vessel's entire equipment, outfit, appliances and of all consumable stores on board the Vessel shall be made by the CHARTERER in conjunction with the OWNER on delivery and again on redelivery of the Vessel. The CHARTERER shall at the time of delivery take over and pay for all bunkers, lubricating oil, water and unbroached provisions, paints, oils, ropes and other consumable stores in the said Vessel at the then current market prices at the ports of delivery.

13. **MAINTENANCE AND OPERATION.**

OWNER represents and warrants that the Vessel, her machinery, boilers, appurtenances and spare parts are in a good state of repair, in efficient operating condition and have been maintained in accordance with good commercial maintenance practice.

The Vessel shall during the Charter period be in the full possession and at the absolute disposal for all purposes of the CHARTERER and under its complete control in every

Page 6 of 15

Initials as to OWNER          Initials as to CHARTERER

respect. The CHARTERER shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice.

The CHARTERER shall take immediate steps to have all necessary repairs done within a reasonable time failing which the OWNER shall have the right of withdrawing the Vessel from the service of the CHARTERER without noting any protest and without prejudice to any claim the OWNER may otherwise have against the CHARTERER under the Charter.

Unless otherwise agreed, in the event of any improvement, structural changes or expensive new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing more than 10 per cent of the Vessel's marine insurance value as stated, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the OWNER and the CHARTERER having regard, inter alia, to the length of the period remaining under the Charter, shall in the absence of agreement, be determined in accordance with Clause 29.

The CHARTERER is required to establish and maintain financial security or responsibility in respect of oil or other pollution damage as required by any government, including Federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The CHARTERER shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterer's sole expense and the CHARTERER shall indemnify the OWNER against all consequences whatsoever (including loss of time) for any failure or inability to do so.

14.    **HIRE.**

(a)    The CHARTERER shall pay to the OWNER for the hire of the Vessel at the lump sum per calendar month as indicated herein, commencing on and from the date and hour of her delivery to the CHARTERER and at and after the agreed lump sum for any part of a month. Hire to continue until the date and hour when the Vessel is redelivered by the CHARTERER to her OWNER.

(b)    Payment of Hire, except for the first and last month's Hire, if sub-clause (c) of this Clause is applicable, shall be made in cash without discount every month in advance on the first day of each month in the currency and in the manner agreed.

(c)    Payment of Hire for the first and last month's Hire if less than a full month shall be calculated proportionally according to the number of days in the particular calendar month and advance payment to be effected accordingly.

Initials as to OWNER          Initials as to CHARTERER

(d)    Should the Vessel be lost or missing, Hire to cease from the date and time when she was lost or last heard of. Any Hire paid in advance to be adjusted accordingly.

(e)    Time shall be of the essence in relation to payment of Hire hereunder. In default of payment beyond a period of five running-days, the OWNER shall have the right to withdraw the Vessel from the service of the CHARTERER without noting any protest and without interference by any court or any other formality whatsoever, and shall, without prejudice to any other claim the OWNER may otherwise have against the CHARTERER under the Charter, be entitled to actual or punitive damages in respect of all costs and losses incurred as a result of the CHARTERER'S default and the ensuing withdrawal of the Vessel.

(f)    Any delay in payment of Hire shall entitle the OWNER to an interest at the rate per annum of 10% or the current market rate in the country where the OWNER has its principal place of business, whichever is greater.

15.    **MORTGAGE(S).**

(a)    The CHARTERER undertakes that it will comply with all such instructions or directions in regard to the employment, insurances, repairs and maintenance of the Vessel, etc.

(b)    The OWNER warrants that it has not affected any mortgage(s) other than those stated herein and that they will inform CHARTERER of any other mortgage(s) being placed on the Vessel, provided, however, any such mortgage(s) placed on Vessel shall recognize OWNER'S obligations hereunder.

16.    INSURANCE AND REPAIRS.

(a)    During the Charter period, the Vessel shall be insured at CHARTERER'S expense against hull, marine, war and Protection and Indemnity risks in such forms as the OWNER deems necessary. Such hull, marine, war and Protection and Indemnity insurances shall be arranged by the OWNER to protect the interests of both the OWNER and the CHARTERER and mortgagees, and the CHARTERER shall be at liberty to protect under such insurances the interest of any managers it may appoint. All insurance policies shall be in the joint names of the OWNER and the CHARTERER as their interest may appear.

The CHARTERER shall, subject to the approval of the OWNER and the Underwriters, effect all insured repairs and shall undertake settlement of all costs in connection with such repairs as well as insured charges, expenses and liabilities (reimbursement to be secured by the CHARTERER from the Underwriters) to the extent of coverage under the insurance herein provided for.

The CHARTERER also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and or not exceeding any possible franchise(s) or deductibles provided for in the insurances. All time used for repairs under the

Page 8 of 15

provisions of sub-clause (a) of this Clause shall count as time on hire and shall form part of the Charter period.

(b)   Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause (a) of Clause 13, all insurance payments for such loss shall be paid to the Mortgagee, if any, who shall distribute the moneys between themselves and the OWNER according to their respective interests. The CHARTERER undertakes to notify the OWNER and the Mortgagee, if any, of any occurrences in consequences of which the Vessel is likely to become a Total Loss as defined in this Clause.

(c)   If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the OWNER in accordance with sub-clause (a) of this Clause, this Charter shall terminate as of the date of such loss.

(d)   The OWNER shall upon the request of the CHARTERER, promptly execute such documents as may be required to enable the CHARTERER to abandon the Vessel to insurers and claim a constructive total loss.

(e)   For the purposes of insurance coverage against marine and war risks under the provisions of sub-clause (a) of this Clause, the value of the Vessel is 3, 100,000.00.

17.   **REDELIVERY.**
The CHARTERER shall at the expiration of the Charter period redeliver the Vessel to Fort Pierce, Florida, or other mutually agreed upon location.

Should the Vessel be ordered on a voyage by which upon the Charter period may be exceeded the CHARTERER to have the use of the Vessel to enable CHARTERER to complete the Voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charterer.

The Vessel shall be redelivered to the OWNER in the same or as good structure, state, condition and class as that in which she was delivered, reasonable and usual wear and tear excepted.

18.   **CONDITION OF VESSEL UPON RETURN OF VESSEL**
That CHARTERER shall return the Vessel to OWNER at the conclusion of the charter in at least the same condition the Vessel was in when received absent ordinary wear and tear. That CHARTERER shall be responsible for and shall replace or make good any injury or damage to the Vessel, its equipment or furnishings, caused by itself, its employees, agents, or passengers, also including the cost of docking and undocking, surveyors fees, in connection herewith.

19.   **RUNNING EXPENSES**
That the CHARTERER agrees to pay for all running expenses (normal operating expenses) during the term of the charter or any extension thereof, including but not limited to, fuel and

Initials as to OWNER          Initials as to CHARTERER

water, deck engine room, consumable stores, pilotage, port charges, consular charges and fees, crew licenses, registration or flag fees, provisions and supplies, suitable dockage, hurricane dockage, dry-docking, repairs and maintenance charges.

20.    REPLACEMENTS
Notwithstanding any language to the contrary, CHARTERER agrees to be responsible for and to replace, repair or pay for any injury or damage to the Vessel caused during the term of the Charter or any extension thereof.

21.    TAXES
That the CHARTERER shall pay all taxes and assessments of any nature that may be assessed against the CHARTERER or the OWNER or operator of the Vessel or the Vessel in connection with the use and operation of the Vessel during the term of the Charter or any extension thereof, including but not limited to, admissions taxes, sales taxes, liquor taxes, penalties and interest thereon, consular charges and fees, crew licenses, registration or flag fees, and any attorneys fees incurred in connection with the collection thereof and shall indemnify the OWNER against any claims, liens and collection efforts in connection therewith.

22.    LOSS OF EARNINGS/BUSINESS INTERUPTION.
That OWNER shall not be responsible for any loss of earnings or business suffered as a result of any repair, maintenance or service due to the Vessel during the Charter or any extension thereof, provided however, that the owner has fully disclosed all known conditions or problems with the vessel.

23.    NON-LIEN and INDEMNITY.
The CHARTERER will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents.

The CHARTERER further agrees to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter period a notice reading as follows:

"THIS VESSEL IS THE PROPERTY OF MONTE CARLO CRUISE CONCESSIONS INC. IT IS UNDER CHARTER TO FISHERMAN'S WHARF EXCURSIONS, L.L.C. AND BY THE TERMS OF THE CHARTER PARTY NEITHER THE CHARTERER NOR THE MASTER HAVE ANY RIGHT, POWER OR AUTHORITY TO CREATE, INCUR, OR PERMIT TO BE IMPOSED ON THE VESSEL ANY LIEN WHATSOEVER."

The CHARTERER shall indemnify and hold the OWNER harmless against any lien of whatsoever nature arising upon the Vessel during the Charter period while Vessel is under the control of the CHARTERER, and against any claims against the OWNER arising out of or in relation to the operation of the Vessel by the CHARTERER. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder by the CHARTERER, the CHARTERER shall at its own expense take all reasonable steps to

Page 10 of 15

Initials as to OWNER          Initials as to CHARTERER

secure that within a reasonable time the Vessel is released and at its own expense put up bail to secure release of the Vessel.

24.   **LIEN.**

OWNER to have a conditional lien upon all cargoes and equipment belonging to the CHARTERER aboard Vessel.

25.   **SALVAGE AND TOWAGE**

All salvage and towage performed by the Vessel shall be for the OWNER'S benefit and the cost of repairing damage occasioned thereby shall be borne by the CHARTERER.

26.   **WRECK REMOVAL**

In the event of the Vessel becoming a wreck or obstruction to navigation, CHARTERER shall indemnify OWNER against any sums whatsoever which the OWNER shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

27.   **ASSIGNMENT AND SUB-DEMISE.**

The CHARTERER shall not assign this Charter nor sub-demise the Vessel except with prior consent in writing of the OWNER. Any such assignment and/or sub-demise shall be subject to such terms and conditions of this Clause.

28.   **TERMINATION**

That the parties agree that the OWNER may terminate the Charter upon the occurrence of any of the following, which shall be deemed to constitute, defaults under the Charter:

(a)   If CHARTERER shall file in any court of the United States or any state a petition in bankruptcy or insolvency or a petition for reorganization or for the appointment of a receiver or trustee of all or substantial part of the CHARTERER'S property, or if CHARTERER makes an assignment for or petition for or enters into an arrangement for the benefit of creditors or if a petition in bankruptcy is filed against CHARTERER which is not discharged within thirty days thereafter; or

(b)   If CHARTERER shall have committed a material breach of the Charter and shall not, within five calendar days have cured such breach. In addition to the breach of any other material provision of the Charter, any failure to effect payment of charter payments when due or payment for repairs or running expenses when due shall constitute a material breach of the Charter which shall entitle the OWNER in their sole and absolute discretion to terminate the Charter. Early termination of the Charter by the OWNER due to non payment of sums due or payable shall not relieve the Charterer of its obligation under the Charter to pay the entire amount of the Charter Hire for the full remaining term of the Charter and to pay sums due and owing for expenses or repairs incurred as well as, attorneys fees and costs associated with the collection of any of these sums.

Initials as to OWNER          Initials as to CHARTERER

(c)   It is expressly understood and agreed that time is of the essence with respect to all payments and reimbursements due the Owner pursuant to this Charter. All payments and reimbursements once made by the CHARTERER to the Owner pursuant to this Charter shall not be refundable. Unless otherwise provided in this Charter, early termination of the Charter shall not relieve the CHARTERER of its obligation to pay the entire amount of the Charter Hire for the full remaining term of this Charter or any extension thereof.

## 29.   INDEMNIFICATION/HOLD HARMLESS

That during the term of the Charter or any extension thereof, the CHARTERER shall agree to indemnify and hold harmless the OWNER and all of its subsidiaries, officers, directors, employees, agents and attorneys against any and all losses, claims, damages or liabilities; joint or several, to which they or any of them may become subject as the result of the CHARTERER'S use and operation of the Vessel or any seizure of the Vessel by any federal, state, county, city, municipal authority, agency or instrumentality or any other governmental agency, or the attachment or levy upon the Vessel by any creditor of the CHARTERER and to reimburse OWNER and the indemnified persons for any legal or other expenses incurred by them in connection with any litigation, civil or criminal whether or not resulting in any liability. This indemnity agreement is in addition to any other liability, which the CHARTERER may otherwise have to the OWNER and/or the indemnified persons.

The OWNER and any other indemnified persons shall have the absolute right to employ any attorney they may choose, individually or collectively, the fees and expenses of such attorney(s) to be at reasonable market rates to be paid by the CHARTERER and to take any action the OWNER and/or the indemnified persons, in their sole and absolute discretion, deem necessary and appropriate upon seizure, attachment of or levy upon the Vessel by CHARTERER creditors. The OWNER and/or any indemnified person may enforce this indemnification agreement by lien against any money or property of the CHARTERER, including but not limited to, a maritime lien against and attachment or seizure of any vessel owned in whole or in part by the CHARTERER without posting bond. The seizure, attachment of or levy upon the Vessel by any federal, state, county, city or municipal agency or instrumentality or by any other governmental agency or by a creditor of the CHARTERER shall not relieve the Charter of its obligation to pay the full amount of the charter hire payments pursuant to this Charter or any extension thereof and to pay any other expenses and/or taxes payable by the CHARTERER pursuant to this Charter or any extension thereof. Notwithstanding any other provision of this Charter, the OWNER may, but shall not be required to submit any claims arising under this indemnity agreement to arbitration.

## 30.   GOVERNING LAW AND FORUM.

This Charter has been delivered to CHARTERER and accepted by CHARTERER in the State of Florida. If there is a dispute, CHARTERER and OWNER mutually agree to:

Initials as to OWNER        Initials as to CHARTERER

(a)    All disputes, controversies or differences that may arise between the parties out of, or in relation to, or in connection with this agreement, shall be heard before a court of competent jurisdiction within Miami-Dade County, Florida.

(b)    OWNER and CHARTERER hereby waive the right to an action *in rem* and also waive the right to a jury trial in any action, proceeding, or counterclaim brought by either OWNER or CHARTERER against the other.

(c)    All disputes shall be governed by principles of general maritime law, and to the extent there is a gap between maritime law and state law, by the laws of the State of Florida.

## 31.    PROHIBITION AGAINST ARREST OF VESSEL

It is mutually agreed that CHARTERER shall not, under any circumstances whatsoever, arrest, seize or attach the Vessel for any and all claims against OWNER or others. Any such attempt to arrest, seize or attach the Vessel by CHARTERER will result in the CHARTERER being liable to the OWNER for all costs, including but not limited to attorney's fees, any court costs, and governmental bonds and fees.

## 32.    WAIVER

No waiver of any breach of or default under this Charter by any party shall be considered to be a waiver of any other breach or default under this Charter.

## 33.    NOTICE

The parties shall give written notice, via first class U.S. Mail, or all acts, and options described herein as follows:

OWNER' Address:

MONTE CARLO CRUISE CONCESSIONS, INC.,
Attention: Dan Teitel
6400 Congress Avenue, Suite 2700
Boca Raton, Florida 33487

**CHARTERER' Address:**

FISHERMAN'S WHARF EXCURSIONS, L.L.C.
Vincent J. DiMento, Esquire
DiMento & Sullivan
7 Faneuil Marketplace
Boston, Massachusetts 02109

## 34.    ENTIRETY OF AGREEMENT

All prior negotiations, understandings and representations are merged into the written terms of the Bareboat Charter and this Agreement; and no modification, waiver, or amendment of

Page 13 of 15

Initials as to OWNER        Initials as to CHARTERER

the Bareboat Charter or this Agreement shall be of any effect unless such modification, waiver, or amendment shall be in writing and executed by the parties.

## 35. BINDING EFFECT

This Charter shall bind and inure to the benefit of the parties, their personal representatives, successors in interest, legal representatives and assigns, where permitted.

## 36. SEVERABILITY

The provisions of this Charter shall be severable and the invalidity or unenforceability of any one or more of the provisions of this Charter shall not affect the validity or enforceability of the other provisions.

## 37. REPRESENTATION AS TO AUTHORITY TO ACT

The undersigned represent and warrant that they are duly empowered and authorized to execute this Charter on behalf of their respective principals.

## 38. REPRESENTATIONS, WARRANTIES AND COVENANTS OF CHARTERER

The CHARTERER further warrant to the OWNER that it is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Massachusetts, that the execution and delivery of this Charter and the performance and observance of the terms thereof, will not conflict with or result in the breach of the terms, condition or provisions of, or constitute a default under or result in or permit the creation or imposition of, any lien, charge or encumbrance upon the Vessel or any part thereof pursuant to any contract, indenture, mortgage, lease or other agreement or instrument to which the CHARTERER is a party or by which the CHARTERER is bound or may be affected. The CHARTERER further represents and warrants to the OWNER that its business complies with and during the term of the Charter of any extension thereof, will continue to comply with all applicable federal, state, county, city and municipal laws, rules, regulations, ordinances and that CHARTERER is not insolvent or bankrupt or is contemplating or is recently contemplating bankruptcy, receivership, or reorganization proceedings, and no petition for bankruptcy, whether voluntary or involuntary, or assignment for the benefit of creditors' right has been filed under the laws of the United States or any state thereof against the CHARTERER and there are no outstanding judgments, decrees or orders which would materially and adversely affect the Vessel or any of the Charterer's business or the obligations of the CHARTERER under this Charter.

Initials as to OWNER          Initials as to CHARTERER

To the true and faithful performances of the foregoing Charter the said parties hereto bind themselves, their heirs, executors, administrators and assigns, each to the other.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands the day and year first above written

**OWNER:**

By: _____

NAME: _DAN TEITEL_

TITLE: _Pres_

**CHARTERER:**

By: _SANDORO CORP_

NAME: _____ PRESIDENT

TITLE: _MANAGING MEMBER_

Initials as to OWNER          Initials as to CHARTERER

# ADDENDUM TO BAREBOAT CHARTER

THIS ADDENDUM TO THE BAREBOAT CHARTER PARTY, between MONTE CARLO CRUISE CONCESSIONS, INC., a Florida Corporation and owner of the Motor Vessel "MIDNIGHT GAMBLER," (hereinafter "OWNER") and FISHERMAN'S WHARF EXCURSIONS, L.L.C., a Massachusetts company, (hereinafter "CHARTERER") entered into on the __15__ day of May, 2000, specifically addresses the starboard engine of the Vessel.

1.  OWNER represents and warrants that the "starboard engine," as that term is customarily defined in the marine industry, is in a good state of repair, in efficient operating condition and has been maintained in accordance with good commercial maintenance practice.

2.  Nothing in this Addendum shall limit or modify the CHARTERER'S duty to maintain the starboard engine in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice.

3.  OWNER promises and covenants to pay the repair costs for any and all necessary repairs to the starboard engine in excess of the Two Thousand five hundred dollars ($2,500.00) that CHARTERER is responsible to pay, provided that the repairs are not a result of the CHARTERER'S failing to maintain the starboard engine in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice.

4.  In the event that repairs are necessary to the starboard engine as a result of CHARTERER'S failure to maintain the starboard engine in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice, the CHARTERER shall be responsible for the entire cost of repair.

5.  OWNER will not be responsible for any and all consequential damages resulting from any and all repair, maintenance, replacement, or service on starboard engine during the Charter or any extension thereof.

6.  OWNER shall not be responsible for any loss of earnings or business suffered as a result of any repair, maintenance, replacement, or service on starboard engine during the Charter or any extension thereof.

7.  This Addendum is controlling only as to potential repairs of the starboard engine.

8.  In the event that repairs become necessary to the starboard engine, the OWNER and CHARTERER agree that during the first seven (7) days of repair, all time used for repairs under this Addendum shall count as time on hire and shall form part of the Charter period, thereafter if the Vessel is still under repair, day eight (8) through day fourteen (14) shall be considered off hire. Commencing on day fifteen (15) regardless of whether or not repairs are completed, the charter period shall recommence.

9.  In the event that repairs become necessary to the starboard engine, the OWNER and CHARTERER will each appoint a surveyor for the purpose of determining and agreeing in writing the condition of the starboard engine and the repairs necessary to put the Vessel back in operation.

10. The OWNER and CHARTERER shall pay for any and all fees with regard to their respective surveyor.

11. In the event that there is a disagreement between the surveyors as to the cost of necessary repairs, OWNER'S surveyor and CHARTERER'S surveyor to choose a third surveyor, who will determine the cost of the necessary repairs. OWNER and CHARTERER agree to be bound by this surveyor's decision. The fees with regard to

this third surveyor shall be split between the OWNER and CHARTERER on a fifty percent (50%) basis.

12.     The minor repairs and replacements set forth on schedule 'A" attached hereto shall be completed by OWNER at OWNER'S sole expense by or before the delivery of the Vessel.

13.     This Addendum is incorporated into the Bareboat Charter entered into on the 8th day of May 2000, and in the event of any ambiguities, inconsistencies, or disputes regarding this Addendum, the language of the Bareboat Charter shall control the rights and obligations of the parties.

To the true and faithful performances of the foregoing Addendum the said parties hereto bind themselves, their heirs, executors, administrators and assigns, each to the other.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands this _20th_ day of May 2000.

OWNER:

By: _____

NAME: _DAN TEITEL_

TITLE: _Pres._

CHARTERER:

By: _SANDURO CORP._

NAME: _____ President_

TITLE: _MANAging member_

3

## SCHEDULE "A"

1.    Replace expansion caps with proper size, 7 pounds and use GATES brand pressure relief types for personal protection.

2.    Flush the fresh water systems and refill with distilled water and antifreeze.

3.    Readjust the belts, these are internal clog types. Tighten until the pulley can be turned in one direction only, by hand.

4.    Some restriction was noted in the raw water systems, clean as reasonably necessary.

5.    Replace zincs on engine and heat exchangers, as reasonably necessary.

6.    Replace raw water intake hoses as they are cracked and need replacing.

4